Filed 4/19/23  Wohlberg v. Craig CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| ANNE WOHLBERG,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CATHRYN CRAIG, as trustee, etc., et al.,<br><br>    Defendants and Respondents. | B313107<br><br>(Los Angeles County<br>Super. Ct. No. 19STPB03004) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel Juarez, Judge.  Affirmed.

James A. Rainboldt for Plaintiff and Appellant.

Donahoe Young & Williams, Mark T. Young and Taylor F. Williams-Moniz for Defendants and Respondents.

Anne Wohlberg (appellant) appeals from a judgment entered after the trial court granted summary judgment in favor of respondents Cathryn Craig, as Trustee of the Gene Wohlberg Irrevocable Trust dated August 27, 2018 (trust), and Michael Alan Wohlberg (collectively respondents) on appellant's petition filed pursuant to Probate Code section 850 seeking to return property held in the trust.

Appellant has failed to show error; therefore we affirm the judgment.

## BACKGROUND

**The family**

Appellant is the widow of decedent Gene Wohlberg. Appellant and Gene Wohlberg were married on June 25, 1978. Gene Wohlberg died on October 14, 2018. Appellant moved into a facility for those with Alzheimer's disease or dementia on November 1, 2018.

Respondents are the biological son and daughter of Gene Wohlberg from a previous marriage. Ingrid Fields and Steven Wohlberg are also the biological offspring of Gene Wohlberg from a previous marriage. Kenneth Brookes and Nancy Dominguez are Anne Wohlberg's biological children from a previous marriage.

**The trust**

The trust was created in August 2018 as a "Medi-Cal" trust "designed to allow Decedent to qualify for Medi-Cal health insurance benefits by placing a portion of Decedent's and [appellant's] assets in the [t]rust." At the time the trust was created, decedent had "no expectations of dying and no terminal health conditions," and "he was concerned that he and [appellant]

2

would not have enough money to live out their retirement." Craig testified that appellant was aware of the trust and was aware of what was going on at the time the trust was created. Appellant was present with decedent and discussed it on a number of occasions. Appellant also accompanied Craig to the bank to make deposits into the trust. Appellant was "aware and consented to the use of community assets to fund the [t]rust." Craig testified: "This was not done lightly. This was conversations with her and [decedent] about what they were trying to accomplish because they knew that risk mitigation was kicking in and they had to do something because dad was not coming out of the facility any time soon. So this was a way to protect whatever money they had for the future."

Appellant was "very well aware of what was going on" during the creation of the trust. Appellant was informed that "if [appellant and decedent] don't do something to preserve these assets, if [decedent's] condition stays, there won't be any money left to do longterm care for him. A skilled nursing or at home is potentially thousands of dollars every month and there won't be money left."

Jane McNamara, the California attorney who assisted decedent and appellant in setting up the trust, testified that "because of the trust and the Medi-Cal planning . . . , [decedent] was approved for Medi-Cal as of October 1. So there was a savings there. So every month that he went forward in living, Medi-Cal would have paid a substantial amount of the nursing home bill, the doctors, his Medicare premiums."

In June 2018, at the decedent's initial consultation with McNamara, decedent informed McNamara that appellant was in the "early/mid stages" of dementia. However, he never expressed

3

any misgivings about appellant's decisionmaking ability, except that she might be unduly influenced by her daughter. McNamara personally spoke with appellant about the creation of the trust. McNamara stated that she and appellant "talked about the irrevocable trust and why we were doing it that way and what was happening with it." McNamara attested that it was decedent's wish that appellant be taken care of, and "it was his belief that the irrevocable trust would preserve the assets so if he or [appellant] were in need, it would be of assistance . . . ." The idea was that there could be a distribution to one of the kids who would then assist appellant with her needs. Half of decedent's community property funds were to be used for the irrevocable trust and for the retainer agreement. McNamara understood that appellant's portion of the community property was not part of the Medi-Cal planning.

On August 27, 2018, Craig became the trustee of the trust. The trust directed that the decedent's assets should be divided among decedent's four children and appellant's son, Kenneth Brookes. Appellant's daughter, Nancy Dominguez, was specifically disinherited.[1] Appellant is not a beneficiary of the trust. However, Craig testified that she understood that her obligation as trustee was to save the money for appellant. Craig stated, "this money was for [appellant's] use. We have been trying to preserve that for her for a very long time. That's what this is for is to help [appellant]." Craig confirmed, "[decedent's] wishes were to have this money in the trust for [appellant] in four years when she needed it . . . and I was happy to—and

---

[1]     Respondents represent that Nancy Dominguez was also disinherited in a previous joint trust dated October 2, 2017. However, the previous trust is not in the record.

4

Michael and Steven and Ingrid, we were happy to make sure to the best of our ability—that this money was here for her."  Craig testified that decedent had calculated that appellant had enough to live on for four years and that his children were directed to preserve the balance of the funds "to cover anything that she needed after that."

**The life insurance policy**

Decedent also had a Genworth Life and Annuity Term Life Policy (policy), which had a benefit of approximately $135,000 upon decedent's death.  In or around November 2017, decedent told respondents that he had stopped making payments on the policy because the premium was too expensive.  Decedent told respondents that if they paid to reinstate the policy and made its premium payments, decedent would change the beneficiary from appellant to respondents.  As a result, on February 15, 2018, respondents paid to reinstate the policy and continued to make the required payments until decedent's death.

Craig was present on March 5, 2018, when the beneficiary change form was signed by both decedent and appellant. Respondents had no reason to believe appellant did not sign the document knowingly and voluntarily.  Decedent had not intended to keep the policy if respondents did not pay to keep it in effect.

### PROCEDURAL HISTORY

On March 29, 2019, appellant filed a "Petition for Return of Property held in the Gene Wohlberg Irrevocable Trust Dated August 27, 2018" pursuant to Probate Code section 850 (petition). The petition named as respondents Craig, as trustee of the trust, and Michael Wolhberg.  The petition alleged that in August 2018 cash in the sum of $200,947.11 was transferred out of a

community brokerage account, and appellant did not consent to the transfer. It was alleged that the trust now holds these funds. Through the petition, appellant requested return of the full amount of these funds. The petition alleged that the trust was created without her "involvement, consent or knowledge." The petition further alleged that respondents changed decedent's life insurance policy for which appellant was the beneficiary. Appellant demanded that respondents return all funds to her and all life insurance proceeds that were paid to respondents, the trust or any other family members.

On May 16, 2019, respondents filed objections to the petition. Respondents stated that appellant was informed and consented to the use of marital funds to fund the trust and was aware of, and consented to, the change of beneficiaries on the life insurance policy. Respondents asserted that appellant "is not of sound mind" and was diagnosed with early onset Alzheimer's disease sometime in 2018.[2] Respondents also asserted that "at the time of the [t]rust's creation, [appellant was] fully aware of the benefits to her then husband and the resulting reduction in assets she might inherit after her husband's death." Respondents asked that appellant's petition be denied.

On July 28, 2020, respondents filed their motion for summary judgment along with a separate statement and appendix of evidence in support of the motion. In the motion, respondents argued that there was no evidence in support of appellant's assertions that marital property had been

---

[2] Upon review of appellant's medical records, respondents corrected this allegation in the motion for summary judgment, confirming that appellant had been diagnosed with dementia in 2019.

6

misappropriated. Appellant objected to being deposed in the matter because she "lack[ed] the capacity to recollect events pertinent to this action" and had "diminished capacity." Her son Kenneth Brookes acted as her attorney-in-fact. Brookes admitted that he has no present knowledge of any of the allegations in the petition, was unaware of appellant's mental state at any time relevant to the proceedings, and had no involvement with appellant's or decedent's estate planning or financial affairs.

Appellant filed an opposition to the summary judgment motion on December 7, 2020. Appellant filed an appendix of evidence in support of her opposition, including a declaration of James Randy Mervis, M.D. Mervis reviewed appellant's medical records and concluded with a "reasonable degree of medical certainty" that she was suffering from progressive dementia that precluded her from having the ability to understand signing the life insurance change of beneficiary in March 2018 and irrevocable trust in August 2018.

On December 11, 2020, respondents filed a reply brief. Among other things, respondents argued that appellant could not allege new facts in opposition to summary judgment to create a triable issue of fact. Respondents also argued that expert opinions acquired after the fact to oppose a motion for summary judgment do not create triable issues of fact.

On January 4, 2021, the trial court issued a minute order granting respondents' motion for summary judgment. The court noted that the evidence "uniformly" contradicted appellant's allegations that community property assets were wrongly used to create the trust and that respondents improperly changed the beneficiary on the policy at issue. The policy beneficiary change form was signed by appellant and copies of checks showing

7

withdrawals showed she took an active role in funding the trust. The court noted that while appellant asserted for the first time in opposition to summary judgment that she lacked capacity to agree or was the victim of undue influence, that such new theories were not properly raised for the first time in opposition to summary judgment. While appellant sought to amend her pleadings, the court cited *Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1264-1265 (*Distefano*) for the proposition that "'[i]f the opposing party's evidence would show some factual assertion, legal theory, defense or claim not yet pleaded, that party should seek leave to amend the pleadings before the hearing on the summary judgment motion.'"

The court's order granting summary judgment and denying appellant's petition with prejudice was entered on March 11, 2021.

On May 12, 2021, appellant filed her notice of appeal from the judgment.

## DISCUSSION

### I. Standard of review

When reviewing a trial court's order granting summary judgment, we independently examine the record to determine whether triable issues of fact exist. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 (*Wiener*).) The initial burden is on the moving party to establish that the opposing party cannot establish one or more elements of the cause of action. After the moving party makes such a showing, the burden then shifts to the opposing party. (*Ibid.*)

In performing the de novo review, we view the evidence in the light most favorable to the losing party. We liberally

8

construe the opposing party's evidence, in order to resolve any evidentiary doubts in that party's favor. (*Wiener, supra*, 32 Cal.4th at p. 1142.) Our review is limited to "the facts contained in the documents presented to the trial court." (*Torres v. Reardon* (1992) 3 Cal.App.4th 831, 836.) We undertake the following three-step analysis: "We first identify the issues framed by the pleadings, since it is these allegations to which the motion must respond. Secondly, we determine whether the moving party has established facts which negate the opponents' claim and justify a judgment in the movant's favor. Finally, if the summary judgment motion prima facie justifies a judgment, we determine whether the opposition demonstrates the existence of a triable, material factual issue." (*Ibid.*)

## II. Summary judgment was properly granted

As the trial court noted, appellant's petition was unclear as to the theory under which she sought relief. She asserted that the sum of $200,947.11 was transferred from a community property account to the trust without her consent. She requested return of the funds in the full amount. She asserted that the trust was created without her "involvement, consent or knowledge." Appellant further alleged that prior to Gene Wohlberg's passing, respondents changed a life insurance policy for which appellant was the beneficiary, naming themselves as beneficiaries. Appellant demanded that the life insurance proceeds be returned to her.

There is no evidence that the transfers in question were done without appellant's consent or knowledge. To the contrary, all evidence shows that appellant was involved, consented, and had knowledge of the transactions.

As to the creation of the trust, there is documentary evidence in the form of checks signed by appellant showing that she took an active role in funding the trust.[3] Testimony on the subject comes from Craig, who testified that appellant was "very well aware" of what was going on with the creation of the trust. In addition, McNamara, the attorney who helped decedent create the trust, testified that she had discussions with appellant regarding the creation of the trust and that appellant was aware of what was going on. There is no evidence to the contrary.

As to the change of beneficiaries on the life insurance policy, appellant's consent is documented by her signature on the policy beneficiary change form. Craig was present when appellant signed the form. There is no evidence that appellant was unaware or did not consent to the change. On the contrary, the only evidence in the record, which was obtained from respondents, was that appellant and decedent could no longer afford to pay the premiums on the policy and it was in danger of lapsing. Decedent therefore offered to change the beneficiary of the policy if respondents paid the premiums.

---

[3] Appellant notes that the checks funding the trust signed by Gene Wohlberg were made out to "Cathryn Craig, Trustee of the Gene Wohlberg Irrevocable trust dated 8/27/18" while the checks funding the trust signed by appellant were made out to "Cash." This alone is insufficient to create a triable issue of fact as to appellant's consent. The checks were all for the same amount and were made from the same account within a few weeks after the creation of the trust. There is no indication in the record that appellant was being deceived as to the purpose of the checks. Craig provided the only testimony on the subject. She stated that appellant knew the checks were for the trust. There is no evidence to the contrary.

In sum, there was no evidence in the record to support appellant's contentions that the act of creating the trust and the act of changing the beneficiary on the life insurance policy was done without her involvement, consent or knowledge.

## III. The court properly declined to consider new theories raised in opposition to summary judgment

Following submission of respondents' motion for summary judgment, appellant asserted new theories that appellant "lacked capacity or was the subject of undue influence." The trial court properly declined to consider such new theories because they were raised for the first time following respondents' motion for summary judgment. (*Distefano, supra*, 85 Cal.App.4th at p. 1264 ["To create a triable issue of material fact, the opposition evidence must be directed to issues raised by the pleadings."].)

Appellant takes issue with this ruling, asserting that appellant's allegation that the trust was created without her "involvement, consent or knowledge" necessarily raised her present contentions surrounding her mental capacity and excessive persuasion.[4] We disagree that allegations regarding appellant's competence may be implicitly found in the pleading. There is a rebuttable presumption that "all persons have the capacity to make decisions and to be responsible for their acts or

---

[4] Appellant represents that Probate Code section 850—the statute under which the petition was brought—generally concerns minors and conservatees, both of whom lack capacity. We disagree with appellant's characterization of the statute as necessarily involving an individual that lacks capacity. Probate Code section 850 is a general provision specifying who can file a petition requesting that the court make an order and does not specifically deal with issues of impairment.

11

decisions." (Prob. Code, § 810, subd. (a).) In the absence of specific allegations that appellant lacked such capacity, respondents had no reason to respond to such a premise. Respondents were entitled to rely on the allegations of the pleadings in preparing their summary judgment motion.[5]

Appellant also asserts on appeal that respondents were acting as fiduciaries to appellant during the time that the transactions were carried out. Significantly, the existence of a fiduciary relationship was not alleged in the petition, nor did appellant allege a breach of fiduciary duty by respondents. However, even if she had made such allegations, the evidence does not support such a claim.

Appellant cites *Barrett v. Bank of America* (1986) 183 Cal.App.3d 1362, 1369, for the proposition that "[c]onfidential and fiduciary relations are in law, synonymous and may be said to exist whenever trust and confidence is reposed by one person in another." There is no evidence in the record that respondents were acting in such a capacity towards appellant.[6] Craig testified

---

[5] Appellant also argues that because, in their objections to appellant's petition, respondents raised the issue of appellant's mental incapacity, respondents themselves have introduced this issue as a triable issue of fact. Respondents' assertion as to appellant's present state of mind are not relevant to the allegations in the petition that the transactions were undertaken without appellant's consent or knowledge. They do not serve to raise a triable issue of fact as to appellant's mental state at the time of the transactions at issue.

[6] Craig agrees that she became a fiduciary as trustee of the trust on August 27, 2018. However, Craig's role as trustee of the trust does not include a fiduciary duty to appellant, who is not a beneficiary of the trust.

that she regularly communicated with decedent about many aspects of his life, including his financial affairs. Michael Wohlberg also stated that he had a close relationship with decedent and communicated with him regularly regarding many areas of his life, including his financial affairs. However, neither of the respondents provided any testimony or other evidence suggesting that they were acting in a fiduciary capacity towards either decedent or appellant. The evidence showed that decedent relied on an attorney in creating the trust. Appellant's assertions that respondents owed her a fiduciary duty are not legally supportable.

Based on the faulty premise that respondents owed her a fiduciary duty, appellant asserts that respondents were required to provide her with full and fair disclosure of the financial transactions that took place prior to Gene Wohlberg's death. She also asserts that undue influence is presumed under such circumstances, and gifts to a fiduciary are presumptively void. We decline to address these assertions in detail, as they were not raised in the petition, and the record does not support them.

Appellant further argues that under Family Code section 721 there is a rebuttable presumption of undue influence when one spouse gains an advantage over the other. As set forth above, appellant never alleged undue influence in her petition, nor did she assert a violation of Family Code section 721. Although it is unclear what specific transaction appellant is referring to with respect to Family Code section 721—the creation of the trust was designed to protect the assets of appellant and decedent in allowing decedent to qualify for Medi-Cal, which it did. There is no suggestion of undue influence in the facts established by the evidence.

13

Appellant cites Family Code section 1100, subdivision (b), which provides that a spouse "may not make a gift of community personal property, or dispose of community personal property for less than fair and reasonable value, without the written consent of the other spouse." Appellant asserts that there is no evidence of compliance with Family Code section 1100, subdivision (b) with respect to the money transferred into the trust or the elimination of appellant's status as beneficiary of the life insurance policy. Appellant apparently takes the position that these transactions constituted gifts to respondents. Again, appellant did not raise this theory in her petition or at any time prior to summary judgment. Further, there is no evidence to suggest that any of the transactions violated this section. Appellant provided her written consent for the replacement of the beneficiary on the life insurance policy, and she participated in the creation of the trust, which was for her benefit. There is no evidence that it was created as a gift to respondents.

Appellant argues that the trial court implicitly considered appellant's mental state while refusing to consider her incapacity to agree to the funding of the trust and the change of beneficiary on the insurance policy. Appellant points out that the trial court stated in its written minute order: "The documentary evidence uniformly contradicts [appellant's] allegations and her own written responses show that she is 'not aware' or does not recall the circumstances surrounding the creation and funding of the trust." Thus, appellant argues, while the trial court observed that appellant was not aware or could not recall these transactions, such conditions are consistent with her present assertions of mental incapacity and undue influence.

14

Appellant never alleged that she had an impaired mental state at the time of the transactions in question or was the victim of undue influence. Nor did she request leave to file an amended petition at any time leading up to the filing of respondents' motion for summary judgment. The trial court noted that appellant was unable to provide evidence in this matter due to her inability to recall. Her present incapacity does not cure the absence of such allegations from the petition, nor does it require the court to assume that she lacked capacity at the time the transactions took place.

IV. **The court properly found that appellant's expert evidence raised for the first time in opposition to summary judgment did not create a triable issue of fact**

Appellant next asserts that the trial court improperly declined to find a triable issue of fact based on the expert opinion evidence submitted by appellant's expert, Dr. Mervis.

The trial court found that respondents correctly argued that expert opinions acquired after the fact to oppose a motion for summary judgment do not create a triable issue of material fact. The court cited *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830 (*Serri*) in support of this decision, quoting the opinion for the general proposition that "expert opinions acquired after the fact to oppose a motion for summary judgment do not create a triable issue of material fact." Appellant argues that the trial court misinterpreted *Serri*, broadly construing the case to dismiss all expert evidence acquired after the events forming the basis of the litigation.

We agree with appellant that the *Serri* decision does not rule out the relevance of all expert testimony based on the date of

15

its acquisition.  In *Serri*, an individual brought an action against her former employer (the University) and others for wrongful discharge based on race and ethnic origin, among other claims. (*Serri, supra*, 226 Cal.App.4th at p. 837.)  The University moved for summary judgment or summary adjudication on all her causes of action.  (*Ibid.*)  The trial court granted summary judgment in favor of the University.  On appeal, the court was asked "to determine whether an employee who is terminated for failing to perform an important job function can avoid summary judgment by arguing, based on expert evidence obtained for the purpose of opposing a motion for summary judgment or summary adjudication, years after the employee's termination, that the failure to perform did not and would not result in any adverse consequences to the employer."  (*Id.* at p. 838.)  Under those circumstances, the *Serri* court found that the "after-acquired expert evidence that there were no adverse consequences from an employee's failure to perform does not create a triable issue of fact on the question whether the employee failed to perform his or her job duties and thus has limited relevance, if any, to the question of discrimination."  (*Ibid.*)  Specifically, the evidence was not relevant to the issues in the case—"whether the University's stated reasons for terminating [the employee] were untrue or pretextual such that a reasonable trier of fact could conclude that the employer engaged in discrimination."  (*Ibid.*)

Thus, the *Serri* court analyzed the expert evidence and considered whether such evidence was relevant to the issues in the case and whether it served to create a triable issue of material fact on such issues.  We conduct the same analysis as to the expert evidence at issue here.

16

Dr. Mervis's declaration is not relevant to any issues in the case because appellant did not raise the issue of her mental health or undue influence at any time prior to the filing of respondents' motion for summary judgment. As set forth above, new theories may not be raised for the first time in opposition to summary judgment. (*Distefano, supra*, 85 Cal.App.4th at p. 1264.) As in *Serri*, the expert opinion offered in opposition to summary judgment is not relevant to the issues in the case. (*Serri, supra*, 226 Cal.App.4th at p. 838.)

## V. Leave to amend or supplement the petition was properly denied

Appellant asserts that on a first demurrer, it is an abuse of discretion to deny a party leave to amend. (Citing *Kolani v. Gluska* (1998) 64 Cal.App.4th 402, 412; *McDonald v. Superior Court* (1986) 180 Cal.App.3d 297, 303-304.) Both cases appellant cites in support of her claim that she should have been granted leave to amend involve demurrers, not summary judgment proceedings. As this matter was decided on summary judgment, the cases are unhelpful to appellant.

Parties are not permitted to change their theory in opposition to summary judgment. "The complaint is supposed to set forth the plaintiff's proposed case, which the defendant's summary adjudication motion then aims to test as a matter of law. But if the plaintiff's opposition moves the factual target after the defendant has fired off its motion, this unfair tactic defeats the utility of the procedure." (*Cohen v. Kabbalah Centre Internat., Inc.* (2019) 35 Cal.App.5th 13, 18.) For this reason, opposition evidence must be directed to issues raised by the pleadings. (*Distefano, supra*, 85 Cal.App.4th at p. 1264.) If the opposing party wants to present a theory or claim not yet

17

pleaded, that party should seek leave to amend before the hearings on the summary judgment motion. (*Id.* at pp. 1264-1265.) Appellant did not do so.

Appellant relies on *FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367 (*FPI*) for the proposition that she should be permitted to supplement her petition through her separate statement in opposition to summary judgment. We note that the *FPI* court affirmed summary judgment for the plaintiff in spite of the defendants' attempt to assert new theories in opposition to summary judgment. (*Id.* at pp. 402-403.) In doing so, the *FPI* court allowed that "some defects in the pleading of an ultimate fact may be remedied by resort to a factual showing in the summary judgment proceeding. In this manner the pleadings may be read together with the factual showings in the summary judgment proceeding for purposes of discerning what is in issue." (*Id.* at p. 382.) However, the *FPI* court acknowledged that "the doctrine of theory of trial permits a variance in proof, the scope of which is ordinarily dependent upon what is pled." (*Id.* at p. 385.) In other words, even allowing for variance from the pleadings, the pleading must "minimally advise the opposing party of the nature of the defense even if defective as conclusory." (*Ibid.*) Only "[i]f the allegations . . . gave notice to the plaintiffs of a potentially meritorious [claim or] defense, [the appealing party is] likewise entitled to reversal of the summary judgment." (*Ibid.*) If the appealing party fails this test, we must affirm the judgment. (*Ibid.*)

Appellant's pleading did not give notice to respondents that she was putting her mental capacity at the time of the transactions at issue. Nor did the pleading give respondents notice that appellant was claiming undue influence. We conclude

18

that the trial court did not err in declining to permit appellant leave to amend or allow appellant's separate statement to supplement her pleading.

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs of appeal.

_____
CHAVEZ, J.

We concur:

_____
ASHMANN-GERST, Acting P. J.

_____
HOFFSTADT, J.